UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 7 2017
```

---

Roberto Hidalgo,

               Plaintiff,

     −v−

New Ichiro Sushi, Inc., et al.,

               Defendants.

---

15-cv-414 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Roberto Hidalgo brings this suit against New Ichiro Sushi, Inc. ("New Ichiro"),

for violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

*See generally* Amended Complaint (Dkt. No. 34). Before the Court are, first, Plaintiff's motion

for partial summary judgment on the issue of successor liability, second, the Defendant's cross-

motion as to the same issue, and third, the Plaintiff's motion to strike the Defendant's cross-

motion as untimely. For the reasons below, the Court grants the motion to strike the cross-

motion, and denies the Plaintiff's motion for partial summary judgment.

## I.   Motion to Strike

The Court first addresses the Plaintiff's motion to strike Defendant New Ichiro Sushi's

Rule 56.1 Counterstatement of Material Facts as untimely, and, more generally, to strike its

cross-motion for summary judgment and opposition to the same. Dkt. No. 101.[1]  For the

---

[1] In his motion, the Plaintiff does not formally request to strike the Defendant's memorandum of law in opposition to the Plaintiff's motion for summary judgment, likely because that memorandum was filed *after* the motion to strike had been received. Given that the effect of striking the Rule 56.1 counterstatement would be to render the Plaintiff's motion effectively unopposed, *see* S.D.N.Y. Local Rule 56.1 (requiring an opposition to include a counterstatement, and finding that any fact not controverted in a counterstatement will be "deemed to be

following reasons, the Court strikes the cross-motion (to the degree it seeks summary judgment for the Defendant), but will consider the Defendant's Rule 56.1 statement and other submitted materials to the degree they merely oppose the Plaintiff's motion for summary judgment.

### A. Relevant Background

On December 8, 2016, the Plaintiff sought leave to file the pending partial motion for summary judgment. Dkt. No. 75. The Plaintiff represented that this case was to be tried to the bench, and noted that, under this Court's individual practices, "[a]bsent good cause, the Court will not ordinarily have summary judgment practice in a non-jury case." Indiv. Civ. Rule 3.G.vii. The Court ordered the Defendant to respond by December 16, 2016. Dkt. No. 77.

On December 20, 2017 (four days past the deadline set by the Court), the Defendant, through its counsel, David Yan, responded by letter. Dkt. No. 79. After apologizing for the lateness of the response (which counsel represented was because he had been under the weather), counsel stated that New Ichiro opposed the Plaintiff's motion for leave to seek partial summary judgment.[2] Dkt. No. 79. Counsel argued that "successor liability is better resolved by the jury trial since the issue of successor liability is [a] mixed question[] of law and fact[]." *Id.* at 1.

Later that day, Plaintiff responded, arguing that the Defendant had never requested a jury trial. Dkt. No. 80. The Court again ordered the Defendant to respond – this time, by December 28, 2017. Dkt. No. 81. On December 28, the Defendant moved for an extension to file a response until January 2, 2017. Dkt. No. 82. The Court granted this request. Dkt. No. 84. Without seeking a further extension, the Defendant filed a responsive letter on January 11, 2017.

---

admitted for purposes of the motion"), the Court construes the motion to strike as seeking, broadly, to strike the Defendant's cross-motion and opposition.

[2] Defendant also contested that this case is to be tried to a jury, an issue the Court has not yet resolved.

Dkt. No. 85 (this time, providing as an excuse that "[d]ue to [an] urgent matter of dealing [with] an unrelated defendant's attempt to avoid [a] court's judgments by closing the restaurant in an unrelated case, the undersigned counsel was not able to respond to the Plaintiff's letter … by January 3 (sic)."). In the letter, in addition to addressing the ongoing dispute as to whether the Defendant could belatedly request a jury trial, the Defendant reiterated that summary judgment was premature. *See id.* at 2 (arguing that the issue of successor liability would turn on "credibility issue[s]").

On January 17, 2017, the Court granted the Plaintiff leave to file a motion for summary judgment, extending the deadline to February 1, 2017. Dkt. No. 87. The Court did not grant or address any motion for leave by the Defendant to file such a motion, as the Defendant had at no point indicated any intention to do so. *Id.* The Defendant's opposition was initially due on February 15, 2017. On February 14, 2017 (a day before the deadline), the Defendant moved for an extension to March 17, 2017, with Plaintiff's consent. Dkt. No. 94. In the letter seeking an extension, the Defendant nowhere indicated it intended to file a cross-motion for summary judgment (nor suggested that the Plaintiff had consented to the extension with such an understanding). Instead, the motion asked for an extension for Plaintiff to file his reply, but did not contemplate that Defendant would then file a sur-reply. *See id.* The Court granted the extension. Dkt. No. 95.

On March 16, 2017 (again, a day before the deadline), the Defendant requested another extension. Dkt. No. 96. He stated that a recent snowstorm had made it impossible for him to meet with his client on that day. *Id.* The Defendant requested, with the consent of the Plaintiff, an extension to March 20, 2017. *Id.* As with his previous extension requests, the Defendant asked only for an extension to file his "opposition to the Plaintiff's motion for summary

judgment" – he made no mention of a cross-motion. *Id.* The Court granted the request. Dkt. No. 97.

On March 20, 2017 (the due date for the Defendant's opposition, per his own extension request), the Defendant filed, on ECF, a notice of a cross-motion for summary judgment. Dkt. No. 98. Contrary to his previous representations, the cross-motion sought summary judgment for the Defendant New Ichiro on the issue of successor liability, and stated for the first time that Defendant's sur-reply brief (not previously referenced in any extension request) would be due April 27, 2017. *Id.*[3] No additional material was filed on the docket in support of the notice.

On March 21, 2017 (one day past the deadline for the Defendant's opposition) the Defendant filed a Rule 56.1 counter-statement. Dkt. No. 99. The 56.1 statement failed to comply with this Court's individual rules, which require that responsive 56.1 statements reproduce the moving parties' entries. Individual Civil Rule 3.G.iv. On the same day, the Defendant filed a declaration of Juhang Wang, the owner of New Ichiro. Dkt. No. 100. No other documents were filed. Later that day, the Plaintiff moved to strike the Rule 56.1 statement as untimely, and to strike the cross-motion as made without leave of court and as unsupported by any memorandum of law. Dkt. No. 101.

On March 22, 2017 (two days past the deadline for the Defendant's opposition) the Defendant filed a memorandum of law in opposition to the Plaintiff's motion and in support of the Defendant's cross-motion. Dkt. No. 102. It thereafter filed a response to the motion to strike. Dkt. No. 104. David Yan represented, in the response, that Mr. Wang works hard at the Defendant restaurant, that the snowstorm had created issues at work, and that Mr. Wang's children had been ill over the previous weekend. *See id.* For these reasons, he stated he had not

---

[3] It is not clear why the cross-motion suggested that the Defendant would have three weeks to file a sur-reply.

4

had time to meet with Mr. Wang to discuss his declaration until Sunday, March 19, and had thus been delayed in filing his motion. He did not explain why he did not move for an extension prior to expiration of the March 20, 2017, deadline. *See id.* Counsel further represented that he would file additional supporting documents later that day (March 22, 2017), but did not seek leave to do so. *Id.* at 2.

On March 24, 2017 (four days past the deadline, and two days later) counsel filed a declaration, attaching, for the first time, additional evidence in support of his cross-motion and opposition. Dkt. No. 105. On March 25, 2017, counsel filed a compliant Rule 56.1 counter-statement. Dkt. No. 106. Finally, later that day, counsel filed a supplemental letter (again without leave of Court) in further opposition to the motion to strike. Dkt. No. 107. In that letter, Counsel represented that he had failed to file his declaration and supporting documents on March 22, 2017 due to difficulty uploading attachments to ECF. *Id.* He also noted that this Court's individual rules do not require leave to file a motion for summary judgment in a jury case, and that the Court had not yet (and has not yet) decided whether to accept the Defendant's untimely jury demand. *Id.*

### B. Legal Standard

Under Federal Rules of Civil Procedure 16(f) and 37, if a party "fails to obey a scheduling or other pretrial order," a court may "strik[e] pleadings in whole or in part" as a sanction. Fed.R.Civ.P. 16(f) (C)("On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney … fails to obey a scheduling or other pretrial order."); Fed.R.Civ.P. 37(b)(2)(A)(iii) (authorizing a court, as a sanction for failing to obey a discovery order, to "strik[e] pleadings in whole or in part"). Under

Federal Rule of Civil Procedure 6, a court may extend any deadline "for good cause" if a request is made "before the original time or its extension expires," but may grant such an extension retroactively only if an "act [is] because of excusable neglect." Fed.R.Civ.P. 6(b).

The resolution of a motion to strike and the determination of whether retroactive extension of a deadline is warranted are both equitable determinations that turn on evaluation of all of the relevant circumstances. *See Purisima v. Tiffany Entm't*, No. 09-CV-03502 (NGG) (LB), 2013 WL 4500699, at *3–5 (E.D.N.Y. Aug. 20, 2013). When the two inquiries are intertwined, courts routinely assess them in tandem. *See, e.g.*, *Luo v. Baldwin Union Free Sch. Dist.*, 677 F. App'x 719, 720 (2d Cir. 2017) (summary order); *Purisman*, 2013 WL 4500699, at *3-5; *McConnell v. Costigan*, No. 00 CIV. 4598 (SAS), 2002 WL 313528, at *14 (S.D.N.Y. Feb. 28, 2002). When assessing a motion to strike, a court should bear in mind that "[s]trong public policy favors resolving disputes on the merits." *Purisman*, 2013 WL 4500699, at *4 (quoting *Am. Alliance Ins. Co. v. Eagle Ins. Co.,* 92 F.3d 57, 61 (2d Cir.1996)); *cf. Luo*, 677 F. App'x at 720 ("[T]he extreme sanction of a default judgment must remain a weapon of last, rather than first, resort." (quoting *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981)). When addressing a retroactive motion for an extension, a court generally weighs four factors to determine whether failure to comply was a result of "excusable neglect": "'[l][t]he danger of prejudice to the [opposing party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was in the reasonable control of the movant, and [4] whether the movant acted in good faith.'" *Purisman*, 2013 WL 4500699 at *4 (quoting *Tancredi v. Metro Life Ins. Co.*, 378 F.3d 220, 228 (2d Cir. 2014)).

## C. Analysis

Assessing all of the relevant circumstances, the Court strikes the Defendant's cross-motion for summary judgment (to the degree it seeks judgment, at this procedural stage, for the Defendant) but denies the motion to strike the Defendant's memorandum and supporting materials to the degree that they oppose the Plaintiff's motion. Examination of the Defendant's conduct weighed against the consequences of striking his materials explains and justifies this result.

The Court first examines the Defendant's conduct. The Court finds that – even assuming, *arguendo*, that counsel's various representations show excusable neglect for the late-filing of its materials merely opposing the Plaintiff's motion – they do not justify the late-filing of the *cross*-motion.

As an initial matter, even as to the opposition materials, it is doubtful the Defendant has shown excusable neglect. The Defendant has a history of late filings in this case: he has represented that such filings are late because, *inter alia*, of his own sickness, of snow storms, and of the illness of his client's children. Any one of these excuses might constitute excusable neglect: together, they suggest a pattern of tardiness that undermines the validity of each individual excuse. Further, these excuses do not explain counsel's repeated failures to request extensions *prior* to the expiration of deadlines. Additionally, the Court notes that, at the time counsel filed his summary judgment submissions past the deadline, he had already requested and a received a month's extension of that deadline. It is no excuse that his client was busy in the last few days before the motion was due, as counsel had had more than six weeks to prepare the relevant materials.

In any event, even if counsel's general delay were excusable, the delay as to the *cross*-*motion* was not. The deadline for the filing of motions for summary judgment in this case was

initially December 30, 2017, but on motion of the Plaintiff, it was extended first to January 20, 2017, and finally to February 1, 2017. Dkt. Nos. 73; 74, 76; 87. The Defendant did not file its cross-motion by February 1, 2017, however, nor request permission to set a briefing schedule whereby it would file its cross-motion at the time its opposition would otherwise be due. As to that due date, in seeking extensions of time to file an opposition to Plaintiff's motion, the Defendant did not once alert the Court that it intended to file a cross-motion. Nor is there any indication from those extension requests that Defendant, in seeking the consent of Plaintiff for multiple-week extensions, ever alerted Plaintiff to the fact that Defendant intended to file such a motion. It is hardly evident that, had the Defendant properly described his intentions in those requests, the extensions would have been consented to by Plaintiff or granted by the Court. That is because the addition of a sur-reply brief by the Defendant would (and ultimately did) extend the briefing schedule by another week, a proposition of relevance to Plaintiff and the Court in assessing the extension requests. Adding these facts to the Defendant's undisputed failure to file any supporting materials to his cross-motion by the date his *opposition* was due, the Court finds that the Defendant has not established excusable neglect for his late-filing of the cross-motion.

Turning to the consequences of striking the Defendant's submissions, the Court finds that equity further supports striking the cross-motion, but not the opposition. Striking the Defendant's opposition altogether would render Plaintiff's motion unopposed. Courts have shown understandable hesitancy to issue such a sanction. *See, e.g.*, *McConnell*, 2002 WL 313528, at *14. In contrast, striking only the cross-motion does not affect the Court's ability to resolve the issue on the merits; it merely removes from the Defendant the opportunity to seek early resolution of an issue that the Defendant itself has represented, multiple times, is not ripe for adjudication at summary judgment. *See, e.g.*, Dkt. No. 85.

8

The Court thus strikes the cross-motion, and will consider the materials submitted solely to the degree that they oppose the Plaintiff's motion for summary judgment. Defendant's counsel is hereby on notice that the Court will not grant any more retroactive extensions absent extraordinary circumstances, and that failure to seek an extension prior to a deadline or otherwise meet that deadline will result in the Court striking future submissions *sua sponte*. Nor should counsel assume this Court will grant any requested extensions.

## II.   Plaintiff's Motion for Summary Judgment

Having struck the Defendant's motion for summary judgment, the only question before the Court is whether Plaintiff has met his burden of demonstrating, as a matter of law, that Defendant New Ichiro is liable as a successor to Ichiro Sushi, Inc. The Court holds that he has not, and therefore denies the motion for summary judgment.

### A.   Factual Background

The following facts are taken from the parties' Rule 56.1 statements, as well as the evidence each party submitted with its respective motion for summary judgment. Where not otherwise noted, these facts are either undisputed or not subject to reasonable dispute based on the record now before the Court. As is evident from the following recitation, however, the parties dispute numerous questions of fact.

### 1.   The Parties

Prior to September 17, 2014, Ichiro Sushi, Inc. ("Ichiro") owned and operated a sushi restaurant at 1604 Second Avenue, New York, New York. Pl. 56.1 ¶1; Def. Resp. 56.1 ¶ 1. Hui Chen was the restaurant's owner. Pl. 56.1 ¶ 12; Def. Resp. ¶ 12.

Plaintiff Roberto Hidalgo was employed at Ichiro as a kitchen helper beginning in May 2010. *See* Dkt. No. 90 ¶ 3 (Hidalgo Aff.).[4]  From 2010 to 2012, Plaintiff was paid $450.00 a week; in 2013, his pay was increased to $500.00 per week; and in 2014 he received $550.00 per week. Hidalgo Aff. ¶ 4.  Hidalgo swore in his affidavit that he was paid in cash for the duration of his work at Ichiro, that he was not paid "time and a half" for work performed above 40 hours per week, and that he did not receive a wage statement indicating his hours, hourly rate, or weekly wages. Hidalgo Aff. ¶ 4.  New Ichiro has no records of the days or hours worked by Hidalgo, or of his compensation. Pl. 56.1 ¶ 29; Def. Resp. 56.1 ¶ 29.

Juhang Wang is the sole shareholder of New Ichiro. Pl. 56.1 ¶ 2; Def. Resp. 56.1 ¶ 2. Prior to buying Ichiro's assets, Wang worked as a sushi chef at Ichiro.  It is unclear from the record whether he began working there on January 10, 2011 or January 10, 2013, although this fact is not material.  Compare Pl. 56.1 ¶ 3; *with* Def. Resp. 56.1 ¶ 3.[5]  Mr. Wang avers that he did not know Hui Chen until he began to work at Ichiro, and that he has no relationship with Mr. Chen beyond having served as his employee and purchased his restaurant. J. Wang Decl. ¶ 10.

## 2. The Purchase

In May 2013, Chen came to Wang and indicated that he wanted to sell his restaurant. J. Wang Decl. ¶ 17.  According to Wang, Chen represented that he was losing money as a result of his high rent and the lost business resulting from construction on the Second Avenue subway

---

[4] The Defendant denies certain of the facts in this paragraph, largely on the ground that it "does not have sufficient information and knowledge" as to their truth. Def. Resp. 56.1 ¶ 27.  The Defendant produces no evidence to dispute these facts, and the Court assumes them to be true for purposes of this motion.

[5] In his December 6, 2016 deposition, Juhang Wang testified that he began work at Ichiro as a sushi chef on January 10, 2011, and confirmed this date several times. *See* Pl. Ex. A. at 13 (hereafter, "J. Wang Dep.").  In a March 20, 2017 declaration submitted in opposition to the Plaintiff's motion for partial summary judgment, Wang instead represented that he had misspoken at his deposition, and that he began work at Ichiro Sushi in 2013. Dkt. No. 100 ¶ 9 (hereafter "J. Wang Decl.").

line. *Id.* Shortly thereafter, in June 2013, Wang incorporated New Ichiro. Pl. 56.1 ¶ 17; Def.

Resp. 56.1 ¶ 17. In October 2013, Mr. Chen offered to sell Ichiro to Wang for between $100,000

and $200,000, and Wang rejected the offer on the basis that he did not believe the restaurant was

worth that much, given its level of business and the nearby construction. Pl. 56.1 ¶ 19; J. Wang

Dep. at 44; J. Wang Decl. ¶ 17. Wang also could not afford the quoted price. J. Wang Dep. At

44; J. Wang Decl. ¶ 19.

As the months went by, business at Ichiro Sushi continued to be slow. Pl. 56.1 ¶ 8; Def.

56.1 ¶ 8.[6] Mr. Chen eventually agreed to sell the restaurant to Yang for $50,000. Pl. 56.1 ¶ 6;

Def. Resp. 56.1 ¶ 1; Pl. 56.1 ¶ 6; Def. Resp. 56.1 ¶ 6. On September 17, 2014, New Ichiro

purchased the assets of Ichiro. *See* Pl. 56.1 ¶ 1; Def. Resp. 56.1 ¶ 1. Wang tendered the $50,000

in cash. Pl. 56.1 ¶ 7; Def. 56.1 ¶ 7. The purchase price was primarily intended to cover the cost

of the existing fixtures. Pl. 56.1 ¶ 8; Def. 56.1 ¶ 8.[7] Ichiro and New Ichiro retained a single

lawyer for the sale and purchase of the restaurant. Pl. 56.1 ¶ 12; Def. Resp. 56.1 ¶ 12.

In the contract and bill of sale, Ichiro agreed to transfer to New Ichiro all of the furniture,

fixtures and equipment at Ichiro, and warranted that the fixtures and equipment were in working

condition at the time of the closing. Pl. 56.1 ¶ 5; Def. 56.1 ¶ 5; Pl. Ex. B, at 3 (the contract of

sale) (listing "property to be transferred" as "[a]ll furniture, fixtures, and equipment"); *id.* at 4

(warranting that the "fixtures and equipment" are in working condition). The contract also

---

[6] In the Plaintiff's statement of undisputed facts, he lists as undisputed the fact that "[w]hen Juhang Wang purchased the restaurant, business was slow, so the purchase price was primarily for the existing fixtures." Pl. 56.1 ¶ 8. Confusingly, the Plaintiff disputes that this fact is undisputed in his responsive 56.1 statement, and contends that it is only the case that Wang *claims* that business was slow. Pl. Resp. 56.1 ¶ 17. In any event, given that it is only the Plaintiff's motion for summary judgment before the Court, it is enough to note that, reading the evidence in the light most favorable to the Defendant, a reasonable jury could find these facts to be true.

[7] Again, Plaintiff presents this fact as undisputed in its own Rule 56.1 statement, Pl. 56.1 ¶ 8, and then disputes it in responding to the Defendant's, Pl. Resp. 56.1 ¶ 17. Reading the record in the light most favorable to the Defendant, a reasonable jury could find this fact.

included an indemnification agreement, stating that Ichiro would indemnify New Ichiro with respect to any judgments, claims, debts, taxes, or other obligations incurred by the Seller, and that New Ichiro would notify Ichiro in the event that any such claims arose. Pl. 56.1 ¶ 32; Def. 56.1 ¶ 32; Pl. Ex. C at 5 (bill of sale). Finally, in a deposition attached to the bill of sale, Hui Chen represented, *inter alia*, that "the said property and each and every part therefor, is free and clear of any and all liens, mortgages, security interest, levies, debts, taxes or other claims or encumbrances except as set forth in the agreement" (there were none in the agreement), and that "[t]here are no actions pending against the Transferor in any court; nor are there any replevins, judgments or executions outstanding, now in force." *Id.* at 4.[8]

### 3. After the Sale

In contrast to the contours of the sale itself (which are largely undisputed), the parties dispute numerous facts as to the degree of continuity Wang maintained between New Ichiro and its predecessor restaurant after the sale.

First, they dispute the degree to which the fixtures, furniture, and other appliances in New Ichiro were different from those at Ichiro. Wang avers in his declaration that he shut down the restaurant for two weeks at the end of September 2014 for substantial renovations, including changing the layout of the dining room, replacing numerous pieces of equipment, replacing the floors, and replacing various appliances. *See* J. Wang Decl. ¶ 25. In response, Hidalgo

---

[8] Although not dispositive of this motion, the Court notes that there is a question of fact when, exactly, the Defendant assumed the lease of the premises. Plaintiff states in his Rule 56.1 statement that New Ichiro took over Ichiro's lease in October 2013. Pl. 56.1 ¶ 18. The record, at minimum, permits a reasonable jury to conclude that New Ichiro did not take over the lease until September 17, 2014 – the date of sale. Ichiro and New Ichiro executed a lease assignment purportedly dated October 2013; however, this document states that the assignment "is subject to the sale of [the] business." Pl. Ex. L (assignment and assumption of lease). Further, Wang stated in his deposition that he would assume the lease only after finishing "the buy and sell procedure." J. Wang Dep. at 51.

submitted a declaration that he worked at the restaurant through October 2014, which he suggests indicates that the restaurant could not have been shut down for two weeks at the end of September 2014.  Hidalgo Aff. ¶ 3; Pl. Resp. 56.1 ¶ 16.  The parties relatedly dispute whether Hidalgo ceased working at the restaurant location prior to the sale of Ichiro, or shortly thereafter. *Compare* Hidalgo Aff. ¶ 3; *with* Ex. J. Wang Dep. at 88-89.

Second, the parties dispute the degree to which the employees at New Ichiro were the same as those at Ichiro.  It is undisputed that Juhang Wang's brother, Yuyi Wang, worked for Ichiro beginning in February 2013, and continues to work for New Ichiro, when the restaurant is busy, as a sushi chef.  Pl. 56.1 ¶ 13; Def. Resp. 56.1 ¶ 13.  Juhang Wang also continues to work at the sushi bar.  Pl. 56.1 ¶ 15; Def. Resp. 56.1 ¶ 15.  Hui Ying Guo, the wife of Hui Chen (the owner of Ichiro), worked as a cashier at Ichiro.  Def. Resp. 56.1 ¶ 74; Pl. Resp. 56.1 ¶ 37.  The Plaintiff states, in his rule 56.1 statement, that Guo worked for New Ichiro for "at least a few months" after the sale.  Pl. 56.1 ¶ 14.  The Defendant purports to deny this fact.  Def. Resp. 56.1 ¶ 14.  However, the record makes clear that Guo did assist at New Ichiro for one or more months after the transition, for the purpose of helping Juhang Wang, who had not previously worked as a manager.  *See* J. Wang Dep. 84-87; Pl. Ex. F. (Guo Decl.) ¶¶3-4.[9]  As to other employees, it is undisputed that some number of workers from Ichiro continued to work at New Ichiro after the transition, but the precise number and proportion is not clear.  *Compare* Pl. 56.1 ¶ 9; Def. 56.1 ¶ 9; J. Wang Dep. at 55 ("Did you fire everyone that worked for Ichiro Sushi? A: No."); Ex. D at 23 (J. Wang Supp. Dep.) ("Q: Was any employee at Ichiro Sushi, the previous restaurant, also

---

[9] The record is less clear as to Guo's precise role.  Wang avers in his declaration that "[i]n a strict sense, … Guo was an independent consultant, not an employee of New Ichiro Sushi, Inc."  Wang Decl. ¶ 39; *see also* J. Wang Dep. at 87 ("I think she's not working for me. I was requesting if she can teach me something.").

remain and work for you new restaurant, New Ichiro Sushi (sic)? A: Few of them, yes, stay to help.").

Third, the parties dispute the degree to which the food at New Ichiro differs from that at Ichiro. It is undisputed that both restaurants served Japanese food. However, while the new menu contains many of the same items as the old one, there are also differences. *Compare* Def. Ex. K (old menu) (listing, under "chef's special roll," the "Rainbow Roll," but no "Angry Dragon Roll"); *with* Ex. L (new menu) (listing, under "chef's special roll," the "Angry Dragon Roll," but no "Rainbow Roll"). Wang also represents that the style of food has changed and now reflects a "fusion Japanese cuisine that is different from the food offered in the old restaurant." J. Wang Decl. ¶ 27.

Finally, the parties dispute the degree to which other details of New Ichiro carried over from Ichiro. It is undisputed that the physical location is the same, as is the phone number. *Compare* Pl. Ex. G (receipt from Ichiro); *with* Ex. H (receipt from New Ichiro). The hours of operation are also largely the same. *Compare* Pl. Ex. G; *with* Pl. Ex. H. The outward appearance of the restaurant is also nearly identical: the lettering of "Ichi Ro" is the same (same size, same font, same location), although the word "new" has been added to the new restaurant's signage. *Compare* Pl. Ex. I; *with* Ex. J.[10]

### 4.   Wang's Knowledge of FLSA Violations at Ichiro

---

[10] At some point after the purchase, Wang added the word "new" to the awnings and signs of New Ichiro Sushi, in his words, "to show [that his] restaurant would provide [] patrons with new taste, new environment, and new experience of their dining." J. Wang Decl. ¶ 26; Pl. 56.1 ¶ 16; Def. Resp. 56.1 ¶ 16. Wang avers that, after substantial renovations, he could not afford to pay for a greater physical makeover. J. Wang Decl. ¶ 26. The record does not establish precisely when this sign was added. J. Wang. Supp. Dep. at 26.

Most significantly, the parties dispute what Wang knew about Ichiro's employment practices at the time of the purchase, and the sufficiency of the steps he took to discover this information.  First, they dispute whether any employment lawsuits were pending or had ever been filed against Ichiro at the time of sale.  Wang represents that no lawsuit under the FLSA or NYLL was filed prior to September 17, 2014 against Ichiro, and that he was not aware of any such lawsuit. Def. Resp. 56.1 ¶¶ 38-39.  The Plaintiff does not dispute that Wang was unaware of any pending or previous suits. Pl. Resp. 56.1 ¶ 2.  The Plaintiff suggests, however, that there is no evidence that *no* lawsuit was pending.  *Id.* ¶ 1.  It is undisputed that neither the lawsuit in this case, nor a related lawsuit against New Ichiro also before this Court had been filed as of the date of purchase.  *See* Dkt. No. 1 (the complaint in this case, filed on January 20, 2015); *Ji Li, et al. v. Ichiro Sushi, Inc., et al.*, No. 14-cv-10242 (AJN) (S.D.N.Y. Dec. 31, 2014) (Dkt. No. 1). Further, the Plaintiff has presented no evidence of any other claims.

Second, the parties dispute certain facts as to Wang and his brother's compensation while employees at Ichiro.  It is undisputed that Wang was sufficiently paid during his time as a chef at Ichiro, and that his rights were not violated under the FLSA or NYLL.  Def. Resp. 56.1 ¶¶ 40-41; Pl. Resp. 56.1 ¶¶ 3-4.  The Defendant further represents that Yuyi Wang, Juhang Wang's brother, was sufficiently paid, and that his FLSA and NYLL rights were not violated.  Def. Resp. 56.1 ¶¶ 42-43.  The Plaintiff contests that Yuyi Wang was paid in keeping with the FLSA, citing to Yuyi Wang's January 30, 2017 affidavit. Pl. 56.1 Resp. ¶ 5.  However, in that affidavit, Wang states that he was paid "approximately $3,000 a month based on [his] hourly wage of $10.00 an hour and overtime wage of $15.00 an hour." Pl. Ex. E ¶ 3 (Y. Wang Decl.).  Wang then proceeds to describe the hours he worked and explains that he was paid in keeping with the FLSA and NYLL.  *Id.*  The Plaintiff offers no particularized explanation why this declaration

15

supports its denial of the Defendant's facts as to the sufficiency of Yuyi Wang's salary, and a reasonable jury could accept them.

Third, the parties dispute what Juhang Wang knew about the Plaintiff's working conditions prior to sale. Mr. Wang avers that he was unaware of the hours or pay of the Plaintiff prior to Wang's purchase of Ichiro. J. Wang Decl. ¶ 14.[11] He also states in his declaration that when he saw Plaintiff, Hidalgo appeared "happy" and never "complained about his working conditions or underpayment of his wages." *Id.* The Plaintiff denies the truth of this statement, arguing that it is not "credible." Pl. Resp. 56.1 ¶ 7.

Finally, the parties debate the ultimate significance of the steps Wang took to investigate Ichiro, but not the contours of these facts. Wang avers that, prior to purchasing Ichiro, he "retained a lawyer to do [a] business search [for] Ichiro Sushi, Inc., and found that [it] owed no money to anyone and had no judgment and lien in its assets." J. Wang Decl. ¶ 17. It is nevertheless undisputed that Wang never obtained copies of the tax returns of Ichiro Sushi. Pl. 56.1 ¶ 21; Def. Resp. 56.1 ¶ 21; J. Wang Dep. at 63-64. Nor did he (or has he ever) obtained payroll records from Ichiro (whether or not such records exist). Pl. 56.1 ¶ 26; Def. Resp. 56.1 ¶ 26; J. Wang Dep. at 63-64. Wang never communicated with Ichiro's accountant. Pl. 56.1 ¶ 22; Def. Resp. 56.1 ¶ 22.

## 5. The Current State of Ichiro Sushi

---

[11] The Plaintiff states that Wang was regarded by customers as the "chef/owner" of the restaurant in May 2013. Pl. 56.1 ¶ 37. As support for this statement, he cites to reviews by customers posted to the web-site Yelp.com. *See* Pl. Ex. N. The Defendant argues that such reviews are inadmissible hearsay and should not be considered by the Court. *See* Def. Resp. 56.1 ¶ 37. Assuming, *arguendo*, that the Court could consider such statements, they would not alter the conclusion herein.

Last, the parties dispute the current ability of Ichiro to cover the cost of any judgment against it for FLSA violations. After the purchase, Wang consulted with Hui Chen, the owner of Ichiro Sushi, to ask him questions about the restaurant. J. Wang. Supp. Dep. at 73. The record is unclear as to when the men last spoke, or as to the precise frequency of these conversations. *Id.* It is undisputed, however, that after the instant lawsuit was filed, and Mr. Wang became aware of it, he called Mr. Chen. He told Chen that the lawsuit was his problem, and Chen responded "I will take care of it" and told Wang not to worry about it. J. Wang Dep. at 60, 107. Nevertheless, in his deposition, Wang averred that, although he was initially able to communicate with Chen, he now "cannot find [Chen] anywhere." *Id.* at 60. Other facts corroborate the Plaintiff's position that Ichiro is unable to satisfy any FLSA judgment. In the related case before this Court, attorney David Yan moved to withdraw as counsel for Ichiro. *See* Motion to Withdraw, *Ji Li, et al. v. Ichiro Sushi, Inc., et al.*, No. 14-cv-10242 (AJN) (S.D.N.Y. Dec. 28, 2016) (Dkt. No. 137). In his declaration in support of that motion, Yan avers that Ichiro lacks the money to pay Yan's legal fees and that, "[t]o [his] best information and knowledge, Ichiro Sushi, Inc. has been dissolved and has no assets." Declaration of David Yan, *Ji Li, et al. v. Ichiro Sushi, Inc., et al.*, No. 14-cv-10242 ¶ 8 (AJN) (S.D.N.Y. Dec. 28, 2016) (Dkt. No. 138). On the other hand, Plaintiff initially brought suit against Hui Chen and Hui Ying Guo. Dkt. No. 34. The Court, however, ultimately dismissed the case against both of them for lack of service of process. Dkt. No. 58.[12]

## B. Procedural History

---

[12] In its March 29, 2016 Memorandum and Order, the Court dismissed the complaint without prejudice against Hui Chen for lack of service of process. *See* Dkt. No. 58 at 4-5. It declined to dismiss the case against Hui Ying Guo, subject to Plaintiff serving Ms. Guo and filing proof of service on the docket within thirty days. *Id.* at 6. The Plaintiff never did so.

Hidalgo filed his initial complaint in this action on January 20, 2015. Dkt. No. 1. The complaint listed Ichiro Sushi, Inc. (as distinct from *New* Ichiro Sushi, Inc.) and Hui Chen as defendants. *Id.* at 1. Hidalgo filed an amended complaint on May 14, 2015, in which he replaced Ichiro with New Ichiro. Dkt. No. 34.

On February 1, 2017, the Plaintiff filed a motion for partial summary judgment as to a sole question: whether the Defendant, New Ichiro, may be held liable for the FLSA violations of its predecessor restaurant, Ichiro, under the applicable doctrines of successor liability. Dkt. No. 88; Dkt. No. 91 ("Pl. Mem."); Dkt. No. 102 ("Def. Opp."); Dkt. No. 109 ("Pl. Reply"); Dkt. No. 112 ("Def. Reply").[13] The Court finds that the Plaintiff has not met his burden of showing that, as a matter of law, successor liability applies. On this basis, the Court denies Plaintiff's motion for partial summary judgment.[14]

## C. Legal Standard for Summary Judgment

Summary judgment is appropriate when, after reviewing the parties' submissions in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom

---

[13] Although the Court has struck the Defendant's cross-motion for summary judgment, it considers his reply brief to the degree it makes arguments relevant to his opposition.

[14] As noted, having struck the Defendant's cross-motion, the Court does not and need not decide whether the Defendant would have been entitled to judgment as a matter of law had its motion been considered.

summary judgment is sought." *Gallo v. Prudential Residential Servs. Ltd.*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### D. The Legal Test for Successor Liability

As an initial matter, the parties disagree as to what test should apply to determine whether New Ichiro may be held liable for the FLSA violations of Ichiro: the traditional and New York common-law test for corporate successor liability, or the federal common-law "substantial continuity" test. *See Xue Ming Wang v. Abumi Sushi Inc.*, No. 15-cv-9860 (GHW), 2017 WL 3504859, at *4-5 (S.D.N.Y. Aug. 14, 2017) (explaining this distinction). The Court concludes that – although not technically necessary to resolve this motion for summary judgment – it will apply the latter test.

### 1. The Court Will Apply the Substantial Continuity Test

Under New York and "traditional" common-law, "a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities" unless one of four exceptions applies. *New York v. Nat. Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). The Plaintiff does not argue that any of the exceptions applies in this case, and the Court agrees. *See* Pl. Mem. at 3.

Instead, the Plaintiff argues that the Court should apply a distinct test federal courts have adopted in the context of various labor and employment claims to assess the question of successor liability: the substantial continuity test. *See Battino v. Cornelia Fifth Ave.*, LLC, 861 F. Supp. 2d 392, 401 (S.D.N.Y. 2012)("Under [the substantial continuity] test, a company that purchases another company's assets may be liable as a successor if there was 'substantial

continuity between the enterprises.'" (quoting *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 43 (1987)).  The Court agrees.

Although the Second Circuit has not yet addressed the question of whether to apply the substantial continuity test in the context of the FLSA, each of the three circuits to address the question has agreed with the Plaintiff.  *See Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.,* 801 F.3d 1079, 1090 (9th Cir. 2015), *cert. denied sub nom,* 136 S. Ct. 2379 (2016); *Thompson v. Real Estate Mortg. Network,* 748 F.3d 142, 151 (3d Cir. 2014); *Teed v. Thomas & Betts Power Sols., L.L.C.,* 711 F.3d 763, 766 (7th Cir. 2013). Further, numerous district courts in this circuit have, relying in part on the logic of these and earlier cases, similarly held that the substantial continuity test applies to FLSA claims.  *See, e.g., Bautista v. Beyond Thai Kitchen, Inc.,* No. 14 CIV. 4335 (LGS), 2015 WL 5459737, at \*4 (S.D.N.Y. Sept. 17, 2015); *Battino,* 861 F. Supp. 2d at 404.

The Court agrees with these decisions for several reasons.  First, applying the substantial continuity test to FLSA claims is a "logical extension of existing case law," given that courts have applied this test in numerous other analogous labor and employment contexts.  *See Steinbach v. Hubbard,* 51 F.3d 843, 845 (9th Cir. 1995) (stating that FLSA's "fundamental purpose is as fully deserving of protection as the ... policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and the MPPAA," other statutes to which courts have applied the substantial continuity test).  Second, applying that test serves an important goal under the FLSA: as the Seventh Circuit has explained, "[i]n the absence of successor liability, a violator of the [FLSA] could escape liability, or at least make relief much more difficult to obtain, by selling its assets without an assumption of liabilities by the buyer (for such an assumption would reduce the purchase price by imposing a cost on the buyer) and then dissolving."  *Teed,* 711 F.3d at 767.

20

Finally, applying the test is not unfair to successive owners. Under the substantial continuity test, a buyer must have had notice of a seller's FLSA violations to be liable as a successor. *See Abumi Sushi Inc.*, 2017 WL 3504859, at *6 (collecting cases). The notice requirement ensures that buyers of a business have the opportunity to negotiate a lower price for the business or negotiate an indemnity clause on the basis of those violations – and thereby limits the imposition of successorship liability to circumstances where it is fair to impose it. *See Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 185 (1973) (holding that the federal test applies in the context of unfair labor practices, in part because "[s]ince the successor must have notice before liability can be imposed, 'his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices" (quoting *Perma Vinyl Corp.*, 164 N.L.R.B. 968, 969 (N.L.R.B. 1967), *enforced sub nom. United States Pipe & Foundary Co. v. NLRB*, 398 F.2d 544 (5th Cir. 1968)).

In the face of overwhelming and persuasive authority that the substantial continuity test applies to FLSA claims, the Defendant makes only one argument to the contrary. He suggests that, applying principles of "fundamental fairness," it would not be equitable to impose on an "unwitting and innocent purchaser" the liabilities of its predecessor. Def. Opp. at 7. The Court does not disagree. However, the test itself already incorporates such equitable considerations. The Defendant's fairness argument, then, while relevant to the Court's application of the test, does not militate against its adoption.

The Court will thus apply the substantial continuity test developed under federal common-law to the instant motion.

2. **The Substantial Continuity Test**

In assessing whether a successor business may be held liable for the employment

violations of its predecessor under the substantial continuity test, courts look to three factors: (1)

whether the new business has sufficient "continuity in operations and work force of" the

previous business to qualify as its successor; (2), whether there was "notice to the successor-

employer of its predecessor's legal obligation"; and (3), whether "[the predecessor is able] to

provide adequate relief directly," such that it would be unfair to place that obligation on the

successor. *Thompson*, 748 F.3d at 151 (internal quotation marks omitted).  Courts in this district

routinely expand this test into nine factors, by turning the first factor – the degree of continuity –

into seven sub-factors. *See, e.g.*, *Bautista*, 2015 WL 5459737, at *5 (listing the nine factors as:

"(1) whether the successor company had notice of the charge or pending lawsuit prior to

acquiring the business or assets of the predecessor; (2) the ability of the predecessor to provide

relief; (3) whether there has been a substantial continuity of business operations; (4) whether the

new employer uses the same plant; (5) whether he uses the same or substantially the same work

force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether

the same jobs exist under substantially the same working conditions; (8) whether he uses the

same machinery, equipment, and methods of production; and (9) whether he produces the same

product." (internal quotation marks omitted)).

Although posited as a multi-factor test, courts have held that "notice and the ability of the

predecessor to provide relief" – factors that collectively address whether successor liability

would be equitable under the circumstances – are "indispensable" to the inquiry. *Abumi Sushi

Inc.*, 2017 WL 3504859, at *6 (collecting cases).

22

Finally, "the party advocating for successor liability bears the burden of proof." *Bautista*, 2015 WL 5459737, at *5. "That rule applies to all portions of the 'substantial continuity' test, including the notice requirement." *Abumi Sushi*, 2017 WL 3504859, at *8; *Battino*, 861 F. Supp. 2d at 405.

### E. Application

Applying the substantial continuity test to the evidence in this case, the Court holds that the Plaintiff has not established, as a matter of law, that New Ichiro is liable as a successor of Ichiro. Substantial questions of material fact predominate over, *at minimum*, two central factors: the notice and continuity inquiries.

#### 1. Notice

First, a reasonable jury could conclude that the Defendant had neither actual nor constructive notice of the Plaintiff's alleged FLSA violations at Ichiro, precluding the Court from granting summary judgment to the Plaintiff.

##### a. Actual Notice

To prove that a successor had actual notice of a predecessor's employment violations at the time of purchase, a Plaintiff may point to evidence that the successor either knew of an actual claim that had been filed against the predecessor, or was aware of the existence of the labor violation (whether or not any claim had been filed at the time of purchase). *See Abumi Sushi*, 2017 WL 3504859, at *8 (collecting cases); *Battino*, 861 F. Supp. 2d at 405.

In the instant case, a reasonable jury could find that the Defendant had no actual notice of any FLSA violations at Ichiro. The Plaintiff has provided no evidence that any suit was pending against Ichiro or had ever been filed against it for labor violations, and it is undisputed that Mr.

23

Wang was aware of no such suit. *See* Def. Resp. 56.1 ¶¶ 38-39; Pl. Resp. 56.1 ¶ 2. As to whether Wang was nevertheless aware of labor violations at Ichiro Sushi notwithstanding the absence of any actual suit, he avers that he had no knowledge of the hours the Plaintiff worked, J. Wang Dec. ¶ 14, and that his own pay was adequate under the FLSA, Def. Resp. 56.1 ¶¶ 40-41; Pl. Resp. 56.1 ¶¶ 3-4. His brother also affirms that his own pay was sufficient. Y. Wang Decl. ¶ 3. On the basis of this evidence, a reasonable jury could find that Juhang Wang had no actual knowledge of the facts giving rise to the Plaintiff's FLSA claim.

### b. Constructive Notice

Even assuming Wang lacked actual knowledge of any labor violations at Ichiro, the Plaintiff argues that Wang had *constructive* knowledge of such violations. Plaintiff observes that Wang failed to request payroll records, speak with Ichiro's accountants or lawyers, or otherwise affirmatively investigate its labor practices. Pl. Mem. at 12. In the Plaintiff's estimation, if the Defendant could have – through the exercise of such diligence – uncovered Ichiro's labor violations, it was constructively on notice of those violations. The Plaintiff has not met his burden of showing, as a matter of law, that the Defendant was on constructive notice of any FLSA violations at Ichiro.

As an initial matter, the Court holds that constructive notice – although a proper theory of liability under the substantial continuity test – is narrower than the Plaintiff represents. To show a buyer was constructively on notice of FLSA violations, it is not enough to merely demonstrate that it could have discovered such violations with the exercise of additional diligence. Instead, the Plaintiff, as a general matter, must point to the existence of certain "red flags" – such as a suspiciously good deal or other relevant facts – that would have put a reasonable buyer on notice that it should have conducted further inquiries. *See Abumi Sushi,* 2017 WL 3504859, at *9.

24

In *Abumi Sushi*, Judge Woods addressed, and persuasively rejected, the proposition that the Court should impute constructive knowledge of a predecessor's FLSA violations to a successor whenever those violations "could have been discovered through due diligence." *Id.* In reaching this conclusion, Judge Woods first convincingly distinguished a 2015 decision by Judge Schofield in which she cited "compelling policy reasons to impute constructive notice on successors who have failed to exercise due diligence" to discover labor violations. *Id.* (quoting *Bautista*, 2015 WL 5459737, at *8). Judge Woods pointed out that, notwithstanding this seemingly broad statement of law, *Bautista*'s factual holding was narrow: Judge Schofield held that "certain red flags—a suspiciously low purchase price and an uncharacteristically quick closing—should have led the defendant to inquire further into the circumstances of the transaction," *id.*, and noted that such facts seemed particularly "nefarious" given that the sale in *Bautista* occurred while the plaintiff was attempting to settle his FLSA claim, and the seller pulled out of that settlement shortly after the sale, *Bautista*, 2015 WL 5459737, at *8.

Having distinguished *Bautista*, Judge Woods then persuasively concluded that – even if Judge Schofield *had* intended to adopt an expansive definition of constructive notice – such a definition was inconsistent with the basic purpose of the notice requirement. As Judge Woods stated, "[i]t is one thing to … expect a purchaser with actual knowledge of red flags to conduct a further inquiry, or to expect a purchaser with actual knowledge of wage underpayment to infer the potential for legal liability. But Plaintiff's proposed rule … would effectively require any purchaser of assets to engage in comprehensive due diligence to discover any potential factual basis for a future claim against the predecessor, regardless of the size of the transaction, the sophistication of the parties, the absence of red flags, or the presence of affirmative representations confirming the absence of violations of law." *Id.* at *10. Such a rule, in Judge

Woods' estimation, would "fatally wound the notice requirement of the substantial continuity test, rendering that critical requirement largely illusory." *Id.* Given that successor liability is a creature of federal common law, Judge Woods concluded that "particularly in the context of a federal statutory scheme like the FLSA, such a[n affirmative] duty [of due diligence] should be imposed not by the courts, but by Congress." *Id.*

The Court agrees with Judge Woods: if a buyer has reason to be suspicious that there are labor violations at the seller's establishment, or that a deal reflects a discount for such violations, he cannot put his head in the sand, benefit from the circumstances of the sale, and later seek to avoid liability. A broader rule of constructive notice, however, could result in the imposition of sweeping affirmative obligations at the time of sale that could subject innocent buyers to unfair liabilities and impede the efficient transfer of assets. Such a rule would not serve the purposes of the substantial continuity test. *See id.* at *7 ("[T]he basic issue in every successorship case is how to strike a proper balance between on the one hand preventing wrongdoers from escaping liability and on the other hand facilitating the transfer of corporate assets to their most valuable uses." (quoting *E.E.O.C. v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988)).

Applying Judge Woods' narrower version of the constructive notice rule, a reasonable jury could find that no red flags existed that would suggest to Wang that he should further investigate. First, a reasonable jury could find that the price of the restaurant – $50,000 – was fair given declining business and nearby construction, and thus that a reasonable buyer in Wang's position would not have suspected this price to be suspiciously low. *See* Pl. 56.1 ¶ 8; Def. Resp. 56.1 ¶ 8; *cf. Abumi Sushi*, 2017 WL 3504859, at *9 ("Plaintiff argues that the $35,000 price that the Appearing Defendants paid for the assets was 'conspicuously low' because it was only half of the yearly rent for the premises. But Plaintiff provides no evidence that such a ratio

26

between the yearly rent and the purchase price of the assets in question here is suspicious or otherwise unexpected." (internal citation omitted)). Indeed, Wang, when asked in his deposition why he did not request tax records detailing Ichiro's profits, responded that he did not think such information was necessary, as he "kn[e]w the situation": Chen was "selling to [Wang for that price] because there[ was] no business." J. Wang Dep. at 64. Second, a reasonable jury could find that Wang had worked at the restaurant for over a year at the time of purchase, and that both he and his brother, in that time, had been adequately compensated under the FLSA. *See* J. Wang Decl. ¶ 13; Y. Wang Decl. ¶ 3. A reasonable jury could find that this record of lawful compensation suggested that Chen met his obligations under the FLSA, and thus that Wang's belief that there were no labor violations at Ichiro was reasonably held. Weighing these facts together, a reasonable jury could find that Wang had no serious reason to believe there was a need to do a deeper investigation into Ichiro's labor practices – i.e. that no red flags suggested the need to look behind the curtain prior to consummating the sale.

In any event, even assuming, *arguendo*, that constructive notice can be applied more broadly – whenever reasonable due diligence by a buyer might have uncovered labor violations not performed, irrespective of any red flags – it would still be a question of fact whether Wang's investigation *was* reasonable under the circumstances. As Judge Woods suggested in his decision, what modicum of diligence is reasonable in any given sale turns on the nature and size of the transaction. *See Abumi Sushi, Inc.*, 2017 WL 3504859, at *9 (rejecting a broad understanding of constructive notice "[t]o the extent that [it would] impose a duty on purchasers to engage in due diligence *without respect to the size of the transaction*" (emphasis added)). A reasonable jury could find that Wang's investigation of Ichiro's labor practices was sufficient, given the size of the transaction. As noted, Wang consulted a lawyer and had first-hand

knowledge of Chen's treatment of two employees at the restaurant: Wang and his brother.  This was not a circumstance, like in *Bautista*, where the buyer (putting aside any red flags), had no knowledge whatsoever of the labor practices of the seller, nor any affirmative reason to believe such practices were legal.  *Cf. Bautista*, 2015 WL 5459737, at *1, *8 (noting that the successor shareholder had "never communicated with the owner" prior to purchase and concluding that "[a]t a minimum, Defendants could have spoken to [the seller's] accountant concerning potential liabilities *or spoken to the chef whom they retained* concerning problems at the Restaurant" (emphasis added)).

In sum, a reasonable jury could find that the Defendant had neither actual nor constructive notice of any FLSA violations at Ichiro prior to the sale.

### 2.  Questions of Material Fact Also Predominate Over the Continuity Inquiry

The Court's finding as to notice is sufficient to deny summary judgment to the Plaintiff.  *See Abumi Sushi Inc.*, 2017 WL 3504859, at *6.  Nevertheless, even assuming, *arguendo*, that notice were not indispensable to the inquiry, numerous questions of material fact exist as to the precise degree of continuity between Ichiro and New Ichiro.  Whether or not such questions of fact, alone, would be dispositive, coupled with the Plaintiff's inability to establish notice as a matter of law, they preclude the Court from granting summary judgment to the Plaintiff.

## III.   Conclusion

In conclusion, the Court denies the Plaintiff's motion for summary judgment and strikes the Defendant's cross-motion.  In light of this disposition, Counsel are directed to appear for a scheduling conference before the Court on October 27, 2017, at 3:30 p.m.  Counsel should confer prior to this meeting and discuss potential trial dates.

This resolves docket numbers 88 and 98.[15]


SO ORDERED.


September ____, 2017
New York, New York

ALISON J. NATHAN
United States District Judge

---

[15] The Court will resolve the parties' pending dispute as to the Defendant's late-filed jury demand in due course.